# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
**No. 22-759V**

| | |
|---|---|
| JEANNIE DELACOUR, Petitioner, v. SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent. | Chief Special Master Corcoran<br>Filed: July 16, 2026 |

*Isaiah Kalinowski*, Bosson Legal Group, Arlington, VA, for Petitioner.

*Felicia Langel*, U.S. Department of Justice, Washington, DC, Respondent.

**ENTITLEMENT DECISION**[1]

On July 12, 2022, Jeannie Delacour filed a petition for compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] Petitioner alleges that an influenza ("flu") vaccine administered to her on October 17, 2019, caused her to suffer an anaphylactic-like allergic reaction, with resulting cardiac and psychological sequelae constituting aggravation of her underlying cardiac/pulmonary condition. Petition (ECF No. 1) at 1; Petitioner's Pre-Hearing Brief, dated July 16, 2025 (ECF No. 36).

The matter went to hearing on October 21, 2025, in Washington, D.C., and is now ripe for resolution. For the reasons set forth in more detail below, I hereby deny entitlement.

---

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its present form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (codified as amended at 42 U.S.C. §§ 300aa-10–34 (2012)) (hereinafter "Vaccine Act" or "the Act"). All subsequent references to sections of the Vaccine Act shall be to the pertinent subparagraph of 42 U.S.C. § 300aa.

## I. Factual History

*Relevant Pre-Vaccination Medical History*

Ms. Delacour's pre-vaccination history includes cardiac issues relevant to this claim. In 2016, she was administered three direct current cardioversions ("DCCVs")[3] to treat recurrent atrial fibrillation. Ex. 2 at 614. She was also at the time suffering from severe chronic obstructive pulmonary disease ("COPD"), and was being treated for it by a pulmonologist (Dr. George Pappas). *Id*. at 497. Additionally, Petitioner was experiencing a great deal of personal stress caring for her son, who was suffering from cancer. *Id.* All of these stressors and medical issues resulted in Petitioner seeking mental health care. *See generally* Ex. 4.

In early 2017, Ms. Delacour was briefly hospitalized to receive another DCCV due to recurrence of atrial fibrillation. Ex. 2 at 606. In the fall of that same year, she was transported by ambulance to a hospital emergency department ("ED") for coughing, wheezing, vomiting, and diarrhea (plus body aches and chills) that she reported began two hours after receiving a flu vaccine. *Id*. at 825. The ED treater speculated that perhaps her condition was "some sort of COPD type exacerbation" associated with the vaccination. *Id.*

In 2018, Petitioner's atrial fibrillation did not recur, and she had no acute exacerbations of her COPD, but she reported "episodes of exertional dyspnea that appear[ed] to resolve on [their] own." Ex. 2 at 1029–1136; Ex. 4 at 148, 171. She received another flu vaccine dose in November 2018, with no reported reaction this time. Ex. 2 at 414.

On April 18, 2019, Ms. Delacour returned to Dr. Pappas for treatment of her "severe COPD and tobacco dependence." Ex. 2 at 1189. Dr. Pappas noted that Petitioner had been "stable…without any acute exacerbations," but "remain[ed] limited by dyspnea." *Id*. That summer, she followed up with cardiologist Jad Swingle, M.D., after presenting to urgent care in June 2019 for an upper respiratory infection and being "found to be in [atrial fibrillation] with controlled rates." Ex. 4 at 178. But this episode of atrial fibrillation was self-limiting and did not require a DCCV. *Id.*

*Vaccination and Reaction in Fall 2019*

On October 17, 2019, Ms. Delacour (then 68 years old) went back to Dr. Pappas for a pulmonary stress test and was seen by Matilda Luttrell, N.P. Ex. 2 at 363. NP Luttrell noted that Petitioner reported experiencing "some increased shortness of breath during the summer" while she was in California "helping [her] son become enrolled into a clinical trial for his cancer," and

[3] "Cardioversion" is defined as "the restoration of normal rhythm of the heart by electrical shock." *Cardioversion*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=8068&searchterm=cardioversion (last visited July 16, 2026).

that she had been smoking more in association with the stress. *Id*. at 365. Upon examination, NP Luttrell noted that Petitioner had increased dyspnea on exertion, as well as exertional hypoxemia[4] that improved with supplemental oxygen. *Id*. at 362, 364. At this exam, Petitioner underwent a six-minute walk test at which time she achieved a distance of 362 meters, with an increase in her heart rate from 52 to 149, and a decrease in her oxygen saturation from 94 percent to 81 percent. *Id.* at 363. (Of note, Petitioner had undergone a similar stress test on October 16, 2018 (approximately one year prior), and achieved a better result - a distance of 436 meters, with an increase in her heart rate from 51 to 79, and a decrease in her oxygen saturation from 98 percent to 86 percent. *Id.* at 1143. As noted below, Respondent's cardiology expert deemed the results of the 2019 test to reflect a decline in performance, thus confirming the progressive severity of Petitioner's CODP.

At this time, Petitioner indicated on her "Adult Screening Checklist for Contraindication to Vaccines" that she had experienced a serious reaction to a flu vaccine two years prior. Ex. 2 at 371. Petitioner received a high-dose flu vaccine during this visit, at around 11 a.m. *Id.* at 363, 373; Ex. 4 at 79.

The afternoon of that same day (at 3:05 p.m.), Petitioner arrived by ambulance to the CHI Franciscan Health ED for treatment of shortness of breath. Ex. 3 at 21. Emergency medical services ("EMS") personnel reported to ED physician Daniel Lieberman, M.D., that Ms. Delacour had suddenly became dyspneic two hours after her vaccination, and that she "had to pull over while driving on the highway secondary to her respiratory distress." *Id.* at 21–22. After EMS personnel treated Petitioner with a nebulizer, she "was intubated in the field for severe increased work of breathing and hypoxia in the mid 80s," and was sedated at the time of her ED presentation. *Id*. at 22.

On exam, Dr. Lieberman noted that Petitioner was hypertensive and in sinus tachycardia, and she had an elevated troponin level (0.46 [0.00-0.04]). Ex. 3 at 25, 27. An echocardiogram showed "moderately reduced" left ventricular systolic function, with a left ventricular ejection fraction ("LVEF") "around 35%." *Id*. at 30. A physician interpreting these results memorialized in the treatment notes that Takotsubo cardiomyopathy[5] should be considered as a possible diagnostic explanation for her symptoms. *Id*. Dr. Lieberman consulted with pulmonology and

---

[4] Hypoxemia is an abnormally low concentration of oxygen in the arterial blood, and stands as a clinical sign of an underlying issue related to breathing or circulation. *Hypoxemia*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=24461&searchterm=hypoxemia (last visited July 16, 2026).

[5] Takotsubo cardiomyopathy, or "broken heart syndrome," is a temporary, reversible weakening of the left ventricle of the heart, often triggered by severe emotional or physical stress (e.g., loss of a loved one,1, acute illness, or surgery), as a result of a rush of stress hormones, such as adrenaline or cortisol. Symptoms mimic a heart attack—chest pain, shortness of breath, and fatigue—but occur without significant coronary artery blockage. *Takotsubo Cardiomyopathy*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=63286&searchterm=takotsubo+cardiomyopathy (last visited July 16, 2026).

cardiology services, and Petitioner was admitted for treatment of possible pneumonia and COPD exacerbation, although he opined that "Taketsubo [sp] cardiomyopathy [was] most likely the cause of [her] symptoms." *Id*. at 38.

That same evening, pulmonologist Frederick Troncales, M.D., examined Petitioner. Ex. 3 at 76. Dr. Troncales diagnosed her with "[a]cute hypercarbic respiratory failure." *Id*. Although Dr. Troncales allowed for a possible vaccine reaction as explaining Petitioner's condition, he noted that "there are no other records to review if she was already coming up with symptoms of COPD exacerbation prior to vaccination." *Id*. Dr. Troncales ordered continued ventilation support with breathing trials, nebulizer treatments, and intravenous steroids, as well as intravenous antibiotics for possible pneumonia. *Id*. at 76–77.

On October 18, 2019, cardiologist Lei Gao, M.D., Ph.D., examined Petitioner (who remained intubated). Ex. 3 at 111. Dr. Gao diagnosed her with "[a]cute resp[iratory] failure, considering drug reaction allergy reaction from the [history], combined with COPD exacerbation." *Id*. at 116. Dr. Gao noted, however, that Ms. Delacour's second echocardiogram was "suggestive of Takotsubo [cardiomyopathy] (stress induced [cardiomyopathy]), which more supported [the] acute stress/allergy reaction story." *Id.* Petitioner was extubated later that day, but that evening her atrial fibrillation recurred. *Id*. at 152, 179. Petitioner was transferred to a cardiac progressive care unit on October 20, 2019. Ex. 3 at 178–79. She now displayed atrial fibrillation and a rapid ventricular rate, was short of breath, and was tearful and "worr[ied] about [her] son's cancer treatment." *Id*. at 179. Dr. Gao started Petitioner on a diuretic for her breathing, and he treated her atrial fibrillation medically. *Id*. at 181.

Three days later (October 21, 2019), cardiologist Freij Gobal, M.D., examined Petitioner and diagnosed her with acute systolic heart failure, cardiomyopathy, atrial fibrillation with rapid ventricular response, and elevated troponin. Ex. 3 at 192. Dr. Gobal noted that she "[had] recent and ongoing stress related to [a] family member illness. Echocardiogram [was] concerning for stress induced cardiomyopathy." *Id*. Dr. Gobal attributed Petitioner's elevated troponin level "to heart failure and stress-induced cardiomyopathy." *Id.*

On October 22, 2019, Petitioner's left heart catheterization and coronary angiogram revealed no evidence of coronary artery disease. Ex. 3 at 138. The next day, Dr. Gobal followed up with Petitioner and noted that she had "no apparent distress and [did] not look pale," and her Takotsubo cardiomyopathy was improving. *Id*. at 206-07. She was discharged on October 26, 2019, and directed to follow up with her cardiologist. *Id*. at 101.

*2019 Post-Hospitalization Treatment*

On October 29, 2019, Petitioner returned to cardiologist Dr. Swingle, who took note of the fact that Petitioner had been hospitalized with "acute respiratory collapse shortly after a flu shot [and] . . . [s]he was intubated for less than 24 [hours]." Ex. 4 at 180. Dr. Swingle diagnosed Petitioner with stress cardiomyopathy that "will likely resolve," and recurrent atrial fibrillation "in [the] context of acute illness." *Id*. That same day, Petitioner followed up with Dr. Pappas's office and again saw NP Luttrell, who noted that Petitioner developed acute respiratory distress after receiving a flu vaccine. Ex. 2 at 340–41. Petitioner reported that she was "breathing better, but still [felt] fatigued." *Id*. at 341.

On November 5, 2019, Petitioner was transported by ambulance to Swedish Cherry Hill Emergency Center ("Swedish Cherry Hill") for chest pain and shortness of breath. Ex. 2 at 110. The attending physician diagnosed her with rapid atrial fibrillation, "which she historically tolerates poorly. Certainly her recent event with stress induced cardiomyopathy may be making this much worse for her." *Id.* Petitioner was admitted for three days and had a successful DCCV. *Id*. at 110, 144, 279. And two repeat echocardiograms showed improvement of her cardiomyopathy. *Id.* at 170, 185–86.

More than a week later, Petitioner followed up with Dr. Swingle, who adjusted her cardiac medications because he was "wary" of "[her] recent myopathy." Ex. 4 at 192–93. She saw Dr. Swingle again that month for possible atrial fibrillation, and he sent her back to Swedish Cherry Hill where she had three DCCVs before returning to normal sinus rhythm. *Id*. at 194–95, Ex. 2 at 23–24.

On December 20, 2019 (now two months post-vaccination), Petitioner was temporarily living in California for her son's cancer treatment, and she took herself to the local hospital ED for evaluation of coughing, wheezing, and shortness of breath. Ex. 5 at 54, 55. She was diagnosed with chronic bronchitis and COPD exacerbation, and was treated with oral steroids and antibiotics. *Id*. at 58–59. On December 27, 2019, Ms. Delacour established care at a California cardiology practice, where she was diagnosed with recurrent atrial fibrillation, and scheduled for a repeat echocardiogram. Ex. 5 at 49, 51.

*2020 Treatment*

Petitioner's son passed away in January 2020. Ex. 5 at 42. That month, she reported continued coughing and wheezing, and was treated with oral steroids. *Id*. at 46. In February, Petitioner followed up with her local cardiologist for evaluation of her recent echocardiogram. *Id.* at 11. She was told that if her atrial fibrillation continued, she would need another DCCV, and one was successfully administered that same month. *Id*. at 3, 13.

Petitioner subsequently moved back to Washington state. In July 2020 (half a year since her last related appointment), she had a telemedicine visit with her primary care physician, Chloeanne Georgia, M.D. Ex. 4 at 197. Petitioner reported "[feeling] chest discomfort," being preoccupied with her son's death, and seeing a counselor. *Id*. at 197–98. That same month she followed up with Dr. Swingle, reporting that the medical episode following her October 2019 vaccination was "'broken heart syndrome'" (i.e., Takotsubo cardiomyopathy). Ex. 4 at 212. Petitioner also reported that she was not currently in atrial fibrillation and her "[b]reathing [was] fine." *Id.*

Three months later, in October 2020, Petitioner had a telemedicine visit with Dr. Pappas for evaluation of COPD exacerbation. Ex. 2 at 11. She reported that "[s]he recently has had symptoms of increased chest congestion and mucus production, along with increased wheezing." *Id*. at 13. Dr. Pappas "reviewed the importance of smoking cessation" with Petitioner, and treated her with oral steroids and antibiotics. *Id*. at 12. An echocardiogram performed that month showed an LVEF of 70%, and Dr. Swingle interpreted it as "good with normal function." Ex. 4 at 46; Ex. 6 at 8. In November, Petitioner returned to Dr. Georgia and reported for the first time ongoing "shakiness" that she claimed had started after her October 2019 vaccination. Ex. 6 at 23–24. Dr. Georgia noted that Petitioner was "[i]nvolved in a lawsuit[6] currently for compensation from that shot. She suffered anaphylaxis and respiratory failure at that time, and since then [she] has had shaking." *Id*. at 24.

*Subsequent Evaluation of Possible Vaccine Association*

Some additional records were filed memorializing treatment Petitioner received in 2021, but while they often reference the October 2019 vaccination—and contain speculation it may have been associated with her consistent cardiopulmonary issues—they do not appreciably advance a causation argument.

In January 2021, for example (now fifteen months post-vaccination), Ms. Delacour saw allergist Arvinder Mokha, M.D., "regarding [her] reaction to influenza vaccine and [to] discuss COVID 19 vaccine." Ex. 6 at 50. Dr. Mokha's notes from this visit take into account Petitioner's purported reaction, along with the fact that she was apparently well prior to the vaccine's administration, but added that "acute heart failure secondary to influenza vaccine would be unique. Not convinced that she is truly allergic to influenza vaccine." *Id.* at 51. Dr. Mokha proposed testing for a potential allergy to the vaccine, but noted the risk of prompting another reaction, especially given her existing COPD. *Id.*

[6] It is not clear what lawsuit is referenced in this particular record. This matter was not filed until July 2022, nearly two years later.

Ten months later, in November 2021, Petitioner returned to Dr. Swingle for recurrence of atrial fibrillation. Ex. 6 at 280. Dr. Swingle obtained Petitioner's consent for another DCCV, although he noted her reluctance given that she continued to grieve for her son's death. *Id.* But the DCCV was later successfully performed that month. *Id.* at 434–35. The next month, Dr. Georgia referred Petitioner to behavioral health for grief counseling. Ex. 6 at 289–91. She also followed up with Dr. Swingle for recurrence of atrial fibrillation. *Id.* at 301. Dr. Swingle noted that "[a]blation would have a modest success rate in this instance. She very much wanted to proceed to ablation after discussing risks and limited estimated success rates." *Id.*

## II. Trial Testimony

### A. Petitioner's Experts

#### 1. *Michael Steven Blaiss, M.D.*

Dr. Blaiss, an allergist and immunologist, offered two written reports and testified on behalf of Petitioner. *See* Report, filed on July 27, 2023 as Ex. 6-2[7] (ECF No. 18-1) ("First Blaiss Rep."); Report, filed on June 4, 2024 as Ex. 31 (ECF No. 26-8) ("Supp. Blaiss Rep."). Dr. Blaiss opined that Petitioner's receipt of the flu vaccine was causal in the development of the worsening of her cardiac complications. First Blaiss Rep. at 7.

Dr. Blaiss attended the University of Georgia for his undergraduate degree, and the University of Tennessee Center for Health Sciences for his medical degree. First Blaiss Rep. at 12; Tr. at 7. He then completed his residency at the University of Tennessee/LeBonheur Children's Medical Center, followed by a fellowship in Allergy/Immunology at the Ochsner Medical Foundation, in New Orleans, Louisiana, where he also held a staff position thereafter. First Blaiss Rep. at 2, 13; Tr. at 7. Dr. Blaiss currently serves as a Clinical Professor of Pediatrics at the Medical College of Georgia at Augusta University in Augusta, Georgia. Tr. at 9. He also practices as an allergist/immunologist, caring primarily for an underserved population of adult patients with allergic conditions, including adverse drug reactions. *Id.* at 7. He is board certified by the American Board of Allergy and Immunology in Allergy and Immunology, as well as in Pediatrics by the American Board of Pediatrics. First Blaiss Rep. at 2, 14. Dr. Blaiss has published over 190 peer-reviewed articles and presented at approximately 500 meetings/seminars, some of which discussed the topic of anaphylaxis and adverse drug reactions. *Id.* at 2.

Dr. Blaiss began with a discussion of anaphylaxis. Applicable diagnostic guidelines note that "[a]naphylaxis is classically described as a type 1 hypersensitivity reaction driven by IgE-mediated release of histamine and other mediators from effector cells (such as mast cells) after

---

[7] Petitioner inadvertently filed two documents as Exhibit 6. The first was the Updated Polyclinic Record and the second was the Expert Report of Dr. Blaiss (which includes his curriculum vitae). Petitioner later filed an updated exhibit list with the relevant documents labeled as Ex. 6-1 and Ex. 6-2 respectively.

allergen exposure." Tr. at 39; T. Dribin et al., *Anaphylaxis Definition, Overview, and Clinical Support Tool: 2024 Consensus Report—a GA²LEN Project*, 156 J Allergy Clin Immunol 406, 409, 411 (2025), filed as Ex. 55 (ECF No. 40-17) ("2024 Consensus Report"). If an individual experiences an anaphylaxis reaction, the development of IgE antibodies will have already occurred due to a previous exposure, and thus symptom manifestation typically occurs rapidly - within minutes to hours. *Id.* at 43. But Dr. Blaiss noted that an individual can suffer an anaphylaxis reaction in the absence of a pre-existing IgE antibody. *Id.* at 45; *see also* 2024 Consensus Report at 411 (stating "[n]on-IgE-mediated anaphylaxis is also well described, particularly to some drugs and certain types of exercise-induced anaphylaxis; symptoms/signs are indistinguishable from IgE-mediated anaphylaxis").

Currently, Dr. Blaiss maintained, there is no standard test for anaphylaxis, with diagnosis mainly based on the patient and clinical judgment. Tr. at 20, 23. But criteria have been established by working groups such as the NIAID (National Institute of Allergy and Infectious Disease)/FAAN (Food Allergy and Anaphylaxis Network), and WAO (World Allergy Organization), although only the NIAID/FAAN criteria have been widely adopted and used in clinical care, whereas the WAO criteria has neither been validated nor uniformly adopted in clinical care or research, thus, contributing to inconsistent patient care and research outcomes. *See* 2024 Consensus Report at 409 (proposing definition and clinical support tool replace previous definitions and clinical criteria for anaphylaxis). As a result, Dr. Blaiss testified, the criteria are merely there to help guide clinicians when determining how likely it is that a patient is having an anaphylactic reaction. *Id.*

The 2024 Consensus Report states that "[t]he clinical criteria are stratified according to type of allergen exposure as not known, likely, or known." 2024 Consensus Report at 409. Although rare, Dr. Blaiss maintained, the flu vaccine "can lead to anaphylactic reactions." Tr. at 24. Thus, Dr. Blaiss classified Petitioner's receipt of the flu vaccine in 2017 as a likely allergen exposure given the rapid post-vaccination onset, akin to her 2019 reaction. Tr. at 26. And it was not uncommon (contrary to Respondent's experts' argument) for an individual to have a history of no adverse reaction to prior similar exposures. Individuals could have numerous exposures to a particular allergen or allergens, but for unknown reasons can all of a sudden develop an adverse reaction. *Id.* at 27. Epinephrine (a catecholamine)[8] is understood to mediate some of the symptoms, and can be produced via the sympathetic nervous system. In the context of an individual suffering from an anaphylactic episode (i.e., shortness of breath), Dr. Blaiss maintained that the body begins to release high levels of endogenous catecholamines. Tr. at 48.

---

[8] "Catecholamine" is defined as "one of a group of biogenic amines having a sympathomimetic action, the aromatic portion of whose molecule is catechol and the aliphatic portion of an amine; examples are dopamine, norepinephrine, and epinephrine." *Catecholamine*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=8276&searchterm=catecholamine (last visited July 16, 2026).

Dr. Blaiss opined that Petitioner's 2019 vaccination had caused an anaphylactic reaction, and for partial support he referenced Petitioner's prior receipt of the flu vaccine in 2017. Relying on the note from her ER visit on October 24, 2017, Dr. Blaiss observed that Ms. Delacour had presented with cough, wheezing, and multiple episodes of vomiting and diarrhea shortly after receiving the flu vaccine. Ex. 2 at 825. Dr. Blaiss maintained that such symptoms were suggestive of an "allergic anaphylactic type reaction," and were not likely caused by a complication of her COPD, as Respondent's expert opined. Tr. at 15. Rather, "patients that start having symptoms related to an exacerbation of COPD, [they] usually start[] over several days and continually worsen." *Id.* Here, however, Petitioner reported no issues the day prior to her receiving the flu vaccine in 2017; instead, she only began to experience symptoms two hours later, meaning they more likely represented an allergic reaction. Ex. 2 at 825; Tr. at 15–16.

Ms. Delacour had a comparable experience when taken to CHI Franciscan Health ED by ambulance for shortness of breath on October 17, 2019 – again, within two hours of receipt of a flu vaccine. Ex. 3 at 21. The medical record of this visit further indicates that emergency medical services were called due to concerns of an allergic reaction—and that Petitioner had noted her prior reaction to the flu vaccine. *Id.* at 22. Based on his reading of the notes, Dr. Blaiss stated that there was nothing else to account for this particular type of reaction. Tr. at 18. Therefore, because Dr. Blaiss opined that Petitioner received the same type of vaccine as in 2017 (i.e., an inactivated flu vaccine), she likely suffered a repeat reaction to a particular allergen. *Id.* at 19.

All of the foregoing was evidence of a rechallenge response, supporting a causal association. Petitioner's receipt of the flu vaccine in 2017 had an impact comparable to what she experienced in 2019, bulwarking the conclusion that she had an anaphylactic reaction. Tr. at 55. In addition, Petitioner had an acute onset of symptoms both in 2017 and 2019 (i.e., within approximately two hours of receiving the vaccine) - a timeframe consistent with an anaphylactic reaction, as opposed to a longer timeframe commonly seen with vaccine-related Guillain-Barré syndrome. *Id.* at 56.

The 2024 Consensus Report also supported the conclusion that Petitioner had likely experienced an anaphylaxis reaction. In 2017, she had experienced a sudden onset of both respiratory and severe gastrointestinal involvement—specifically, coughing and wheezing, as well as multiple episodes of vomiting and diarrhea. Tr. at 31, 32; 2024 Consensus Report at 412 (suggesting a likely or known allergen exposure when an individual has a sudden onset of two or more anaphylaxis organ systems (i.e., skin/mucosal, respiratory, cardiovascular, or gastrointestinal). She received the same form of vaccine (a killed inactivated flu vaccine) in 2019, at which time she similarly developed a sudden onset of respiratory problems, strengthening Dr. Blass's opinion that she "very clearly" met the criteria for a known allergen exposure. Tr. at 32;

*see also* 2024 Consensus Report at 412 (requiring the sudden onset of *either* respiratory involvement following exposure to a non-inhaled allergen, or cardiovascular involvement).[9]

Respondent's experts disputed an anaphylaxis diagnosis, in part because Petitioner was not treated with epinephrine. But Dr. Blaiss noted that the 2024 Consensus Report stated that "treatment with epinephrine should not be linked to anaphylaxis diagnosis," as "[t]here will be patients who receive epinephrine whose presentation does not fulfill anaphylaxis criteria, and there will be patients who do not receive epinephrine whose presentation fulfills the criteria." 2024 Consensus Report at 410. While Dr. Blaiss acknowledged that the "gold standard" for treatment of anaphylaxis is the use of epinephrine, he further acknowledged that there are scenarios in which an individual is not given epinephrine but indeed has suffered an anaphylactic reaction. Tr. at 30. Similarly, Dr. Blaiss testified that evidence of skin symptoms is not necessary when making an anaphylaxis diagnosis, despite such symptoms occurring in a majority of patients. *Id.*

In addition, Respondent's experts had criticized Petitioner's reliance on literature involving vaccination and symptom onset of Petitioner's Takotsubo cardiomyopathy—arguing that the expected onset was significantly longer than what Petitioner experienced herein. Tr. at 52. But Dr. Blaiss contended that the release of catecholamines in response to Petitioner's shortness of breath shortly following the receipt of the flu vaccine occurred "fairly immediately," and thus reflected a different immunologic reaction than what is described in some of the filed medical literature. Tr. at 50, 52.

Dr. Blaiss did not deem Petitioner's preexisting conditions as explanatory of her post-vaccine reaction. At the time of her initial hospitalization following the October 2019 vaccination, Petitioner's lungs were clear despite being treated with antibiotics, and Petitioner had suffered from her shortness of breath episode while driving as opposed to after exercise (i.e., as a result of exertional hypoxia). Tr. at 58, 59. Petitioner's pre-existing COPD was also an unlikely trigger for such a significant release of catecholamines, given that she had a documented history of COPD prior to 2017. *Id.* at 60. Although the medical records indicated that Petitioner had reported some increased shortness of breath prior to the receipt of the flu vaccine in October 2019, she apparently had not been using her inhaler regularly or her oxygen, meaning treatment lapses were the more likely cause of those symptoms. *Id.* at 60–61; Ex. 2 at 341, 365 (noting that Petitioner does not wear supplemental oxygen much when she is not at home).

Dr. Blaiss concluded his direct testimony pointing out that as reflected in certain medical records, Petitioner's treating physicians seemed to accept that she had experienced a vaccine-

[9] Dr. Blaiss briefly addressed the significance of Petitioner's receipt of the flu vaccine in 2018, at which time she did not experience any reported adverse reaction. He attributed this to the fact that Petitioner had received an entirely different formulated vaccine than what she received in 2017 and 2019. Tr. at 36. He further noted that this particular formulation of flu vaccine is often recommended for patients who have experienced a previous allergic reaction. Accordingly, Dr. Blaiss argued, it made sense why Petitioner's reaction to this vaccination was different. *Id.*

associated anaphylactic reaction. *See generally* Tr. at 66–72 (discussing, inter alia, Ex. 3 at 149 (noting Petitioner "was admitted for acute resp[iratory] failure, … considering [secondary] to flu shot and allergy reaction, …")). On cross, Dr. Blaiss attempted to reconcile his statement in his supplemental report that "[Petitioner's] reaction to the influenza vaccination may not be classic anaphylaxis." *See* Tr. at 73 (citing Supp. Blaiss Rep. at 3). He was asked to address a note from Petitioner's ED appointment on October 24, 2017, stating that Petitioner received the flu vaccine at 2:30 p.m., but four hours later had "abrupt [nausea/vomiting/diarrhea]." *See* Ex. 2 at 834. He acknowledged that it was atypical for gastrointestinal symptoms in response to an anaphylactic reaction to occur in such a timeframe, but maintained that it could still occur. Tr. at 76, 85.

2. *Benjamin Danis, Ph.D.*

Dr. Danis, a clinical psychologist, offered a declaration and testified as one of Petitioner's treating physicians at hearing. *See generally* Tr. at 90–101; Declaration, dated Nov. 2, 2023 (ECF No. 20-2) ("Danis Decl.").

Dr. Danis received his undergraduate degree from Georgetown University, his master's degree in psychology from Catholic University, followed by his Ph.D. in psychology from Syracuse University. *See* Danis Decl., Attach. 1 at 10–11; Tr. at 90. Shortly thereafter, he began treating patients in a clinical setting for over forty-five years, and specializes in the treatment of patients with depression, anxiety, and bipolar disorder. Danis Decl. at 1; Tr. at 91. In addition, Dr. Danis has consulted for the Seattle Cancer Care Alliance, working with both patients and family members of patients diagnosed with various forms of cancer. Danis Decl. at 2; Tr. at 92.

Dr. Danis began treating Petitioner in June 2018 for depression and anxiety stemming from her son's cancer diagnosis. Danis Decl. at 2; Tr. at 94. Following a gap in treatment, Petitioner returned to Dr. Danis in May 2020 on a regular basis. Danis Decl. at 4; Tr. at 94–95. At these therapy sessions, Petitioner discussed at great length, her post-vaccination mental health. Tr. at 95. Over the course of seeing Petitioner in a clinical setting, Dr. Danis changed her diagnosis from significant depression and moderate anxiety to post-traumatic stress disorder ("PTSD") "based on the length of time that [Petitioner] was reporting sequelae of her medical experience following vaccination." Tr. at 95. He further described Petitioner's psychological condition post-vaccination as significantly worse than pre-vaccination. *Id.* at 96. Relying on the DSM-3 and DSM-5, Dr. Danis evaluated Petitioner's condition and found that she met the diagnostic criteria for PTSD, and he maintained it arose out of her post-vaccination medical experience. *Id.* at 99.

On cross, Dr. Danis briefly reiterated his reasoning for opining that Petitioner suffered an adverse reaction to the flu vaccine on October 17, 2019—stating that Petitioner called him while in the hospital explaining that she was fearful to return home and that she did not believe she was ready. Tr. at 205. In an attempt to address some of the anxiety Petitioner was feeling, Dr. Danis walked through some breathing exercises with Petitioner and reassured her that he would continue

to work with her when she returned home. *Id.* He further acknowledged that he "never used the vaccine reaction as a diagnosis." *Id.*

3. *Andrew J. Doorey, M.D.*

Dr. Doorey, a cardiologist, offered two written reports and testified on behalf of Petitioner. *See generally* Tr. at 107–23; Report, dated June 3, 2024 (ECF No. 26-1) ("First Doorey Rep."); Report, dated Dec. 5, 2024 (ECF No. 31-1) ("Supp. Doorey Rep."). Dr. Doorey opined that Petitioner's development of Takotsubo cardiomyopathy was "causally related to an acute reaction to the influenza vaccine that she received on October 17, 2019." First Doorey Rep. at 3.

Dr. Doorey received his undergraduate degree from Princeton University, and his medical degree from Harvard Medical School. *See* First Doorey Rep. at 8. He then completed his internship and residencies in the Department of Internal Medicine at the University of Michigan Hospital, followed by fellowships in Cardiology and Invasive Cardiology and Angioplasty at Brigham and Women's Hospital and Harvard Medical School and the University of Heidelberg, respectively. *Id.*; Tr. at 109–110. He currently sees patients in a clinical setting at the University of North Carolina Health Care System. *Id.* at 1. Dr. Doorey is a Professor of Clinical Cardiology at the University of North Carolina School of Medicine, and he is board certified by the American Board of Internal Medicine in Internal Medicine, Cardiovascular Diseases, and Interventional Cardiology. *Id.* at 1, 9; Tr. at 109. Throughout his clinical cardiology practice, Dr. Doorey has seen, diagnosed, and managed patients with Takotsubo cardiomyopathy. *Id.* at 2; Tr. at 112.

Takotsubo cardiomyopathy, Dr. Doorey explained, can be caused an acute episode of stress of almost any sort. Tr. at 117. The mechanism by which this occurs is likely "an outpouring of catecholamines, adrenaline and [similar] hormones." *Id.* In Takotsubo cardiomyopathy, the body experiences an "extreme elevation of [ ] stress hormones that [then] causes the clinical syndrome of Takotsubo." *Id.* at 118. The release of catecholamines following an acutely stressful event would typically occur quickly (i.e., within twenty-four hours), as likely occurred herein. *Id.* 118–19.

Dr. Doorey stated that Petitioner "ha[d] a pretty classic case" of Takotsubo cardiomyopathy. Tr. at 114. Dr. Doorey based his opinion on Petitioner's echocardiogram (which revealed heart contractions at the top, and absent contractions at the bottom), her elevated troponin levels, and a subsequent normal echocardiogram. *Id.* at 114–15. In addition to Takotsubo cardiomyopathy, Petitioner's treating physicians also noted that she suffered from atrial fibrillation with rapid ventricular response. *Id.* Dr. Doorey stated that Petitioner's cardiac health (presenting as the previously-mentioned conditions) was significantly worse following her receipt of the October 2019 flu vaccine. *Id.* Thus, Dr. Doorey concluded Petitioner's cardiac condition was likely due to the stress brought on by her anaphylactic reaction. *Id.* at 117.

In response to the assertion that Petitioner's Takotsubo cardiomyopathy might instead be attributable to her more chronic health conditions, Dr. Doorey maintained that the condition is more commonly caused by an acute stressor, such as experiencing shortness of breath, leading to intubation, which in turn causes the release of catecholamines, which occurred herein. Indeed, he opined that approximately "90 percent plus of Takotsubos occur right after an acute stress such as [what happened herein]." *Id.* at 121. Thus, chronic health issues were less likely to explain it.

B. Respondent's Witnesses

1. *Olajumoke Fadugba, M.D.*

Dr. Fadugba, an allergist and immunologist, offered two written reports and testified on behalf of Respondent. *See generally* Tr. at 126–87; Report, dated Nov. 27, 2023 (ECF No. 22-1); Report, dated Aug. 13, 2024 (ECF No. 27-1).

Dr. Fadugba received her undergraduate degree from the University of Delaware and her medical degree from Vanderbilt University School of Medicine. Curriculum Vitae, filed as Ex. A-1 (ECF No. 22-2) ("Fadugba CV"); Tr. at 126. She then completed an internship and residency in Internal Medicine at Washington University School of Medicine, followed by a fellowship in Allergy and Immunology at Vanderbilt University School of Medicine. Fadugba CV at 1; Tr. at 126–27. She currently is an Associate Professor of Clinical Medicine at the University of Pennsylvania within the Division of Allergy and Immunology, where she also serves as the Chief of Allergy and Immunology and Recruitment Direction for the fellowship program. Tr. at 127. She is board certified by the American Board of Internal Medicine and Allergy and Immunology. Fadugba CV at 1. In addition, Dr. Fadugba routinely sees patients with anaphylaxis, including food and drug allergies. Tr. at 127.

Dr. Fadugba began her testimony by differentiating between an allergic reaction and anaphylaxis. She defined an allergic reaction as "a broad categorization of hypersensitivity to an agent that [an individual is] exposed to." *Id.* at 133. This can include immediate allergic reactions that occur within minutes to hours, as well as those with delayed reactions that take as long as hours to days. *Id.* On the other hand, anaphylaxis is considered a type of allergic reaction in the most severe form, according to Dr. Fadugba. *Id.* at 134. She further noted that anaphylaxis can involve multiple organ systems. *Id.*

Dr. Fadugba proceeded to discuss the different clinical criteria, or diagnostic guidelines, put forth by the NIAID and WAO for anaphylaxis. In her view, only the NIAID criteria have been validated. Tr. at 135. Those criteria outline three different scenarios in which an individual could be diagnosed with anaphylaxis. The first involves the "[a]cute onset of an illness (minutes to several hours) with involvement of the skin, mucosal tissue, or both (e.g., generalized hives,

pruritus or flushing, swollen lips-tongue-uvula)," and either respiratory involvement or cardiovascular involvement, regardless of whether there is any known preceding allergen. *Id.* at 136; *see also* D.B.K. Golden et al., *Anaphylaxis: A 2023 Practice Parameter Update*, 132 Ann Allergy Asthma Immunol 124, 134 Table 5 (2024), filed as Ex. C-1 (ECF No. 27-2) ("Golden"). The second scenario requires "[t]wo or more of the following that occur rapidly after exposure to a likely allergen for that patient (minutes to several hours)", such as skin/mucosal involvement, respiratory symptoms, cardiovascular symptoms, or gastrointestinal symptoms. Tr. at 136; Golden at 134. And the third scenario requires only evidence of reduced blood pressure following exposure to a known allergen for the individual (minutes to several hours). Golden at 134. For an adult patient specifically, a systolic blood pressure of less than 90 mm Hg or greater than 30% decrease from the individual's baseline, is needed to be consistent with the diagnosis. *Id.*

The WAO criteria, on the other hand, outline two scenarios for which anaphylaxis is likely. Pursuant to the first, anaphylaxis is likely where there is an "[a]cute onset of an illness (minutes to several hours) with [the] involvement of the skin, mucosal tissue, or both (e.g., generalized hives, pruritus or flushing, swollen lips-tongue-uvula) and at least" the involvement of either respiratory symptoms, cardiovascular symptoms, or gastrointestinal symptoms. Tr. at 136; Golden at 134. This first scenario does not require that the individual be exposed to a likely allergen. Tr. at 137. The second requires the "[a]cute onset of hypotension or bronchospasm[ ] or laryngeal involvement after exposure to a known or highly probable allergen for the patient (minutes to several hours), even in the absence of typical skin involvement." Golden at 134. Dr. Fadugba also briefly discussed the 2024 Consensus Report—noting its overall goal was to reconcile the criteria set forth by the NIAID and the WAO and provide a support tool with three clinical scenarios under which an individual could be diagnosed with anaphylaxis. Tr. at 138.

Dr. Fadugba did not dispute that the flu vaccine could constitute an allergen capable of instigating an anaphylactic reaction, but deemed this to be a rare occurrence. Tr. at 139; *see also* J. M. Kelso et al., *Adverse Reactions to Vaccines Practice Parameter 2012 Update*, 130 J Allergy Clin Immunol 25 (2012), filed as Ex. A-7 (ECF No. 22-8) (finding that "[a]naphylactic reactions to vaccines are estimated to occur at a rate of approximately 1 per million doses" and "[t]here are approximately 220 million doses of vaccines distributed in the United States each year"). But she did not view the specific vaccine formulation as bearing on the likelihood of a vaccine allergic response. Tr. at 140. The record in this case, she noted, established that Petitioner had received three flu vaccine doses in the 2017-19 period. In 2017 and 2019, she received a high-dose Fluzone vaccine (i.e., an inactivated vaccine propagated in embryonic chicken eggs), and in 2018 she received the Flublok quadrivalent vaccine (a recombinant vaccine propagated in insect cells). *Id.* at 141. But (and somewhat contrary to Dr. Blaiss's assertions) the strains involved in the 2017 and 2018 vaccines are actually very similar and have some overlap, in comparison with the 2019 vaccine.

The timing of an allergic reaction following the exposure to any likely allergen typically occurs within minutes to hours, according to Dr. Fadugba, and the rapidity of the reaction depends on several factors including the "route of exposure." Tr. at 143. For example, something that is introduced either intramuscularly or intravenously will typically lead to a quicker reaction than if introduced orally. *Id.* at 143–44. Dr. Fadugba also argued that evidence of prior reactions can play a role in the rapidity of the reaction. *Id.* at 144.

Dr. Fadugba next reviewed Petitioner's reported vaccine reactions, beginning with the 2017 vaccination. She opined that Petitioner's clinical presentation following her receipt of a flu vaccine on October 24, 2017, was atypical for anaphylactic reaction, because "[t]he vast majority of anaphylactic reactions occur much more quickly than [what occurred herein]." Tr. at 146. Since Petitioner had received that vaccine intramuscularly, Dr. Fadugba would have expected a reaction to occur almost immediately (i.e., within thirty minutes to an hour), not within two to four hours as here. *Id.*

Dr. Fadugba expressed the same view—that the reaction was essentially too slow to constitute an allergic response—with respect to Petitioner's receipt of the flu vaccine on October 17, 2019. Tr. at 151. In so opining, Dr. Fadugba disagreed with Petitioner's expert, Dr. Blaiss, that Petitioner met the criteria set forth in the 2024 Consensus Report—specifically, the second scenario. Tr. at 148; 2024 Consensus Report at 412. To support her position, Dr. Fadugba explained that the second scenario involves a "likely or known" allergen exposure, but at that time the flu vaccine was not a likely or known allergy for Petitioner. Tr. at 148, 149. Dr. Fadugba opined that Petitioner had never reacted to the flu vaccine previously, so it certainly was not a known allergen, and again her symptoms occurred outside of the typical window for anaphylactic reaction to an intramuscular therapy. *Id.* at 150. Instead, she maintained there were alternative explanations for Petitioner's sudden onset of respiratory issues two hours post-vaccination in 2019. *Id.* at 154.

In conclusion of her direct testimony, Dr. Fadugba briefly discussed Petitioner's proposed causal mechanisms. She maintained there was a lack of medical literature supporting such theories—noting Petitioner's reliance on case reports, which had limited value in establishing causality. Tr. at 159, 160.

On cross-examination, Dr. Fadugba acknowledged that treatment with epinephrine or antihistamines is not necessary to make a diagnosis of anaphylaxis. Tr. at 164. She further acknowledged that Petitioner was not exerting herself or otherwise physically active at the time of leaving the doctor's office on October 17, 2019, and that there was no evidence in the medical records to suggest that Petitioner was suffering pneumonia or an active infection prior to her episode of shortness of breath. *Id.* at 165, 166. Dr. Fadugba did, however, emphasize other potential contributing factors to Petitioner's shortness of breath, including her severe COPD, love FEV1 levels, as well as hypoxia caused by a stress test. *Id.* at 169.

2. *Shane LaRue, M.D.*

Dr. LaRue is a cardiologist, and he offered two written reports and testified on behalf of Respondent. *See generally* Tr. at 192–214; Report, dated Dec. 20, 2023 (ECF No. 23-1) ("First LaRue Rep."); Report, dated Aug. 13, 2024 (ECF No. 28-1) ("LaRue Supp. Rep."). Dr. LaRue opined that Petitioner's receipt of the flu vaccine was not related to or causal of her Takotsubo cardiomyopathy and atrial fibrillation. First LaRue Rep. at 8.

Dr. LaRue received his undergraduate degree from the University of Wisconsin-Madison, and his medical degree from the Medical College of Wisconsin. Curriculum Vitae, filed as Ex. B-1 (ECF No. 23-2) ("LaRue CV") at 1; Tr. at 192. He then completed his internship and residency in Internal Medicine at the University of Wisconsin Hospitals and Clinics, followed by a fellowship in Cardiology at the Washington University School of Medicine. LaRue CV at 1–2; Tr. at 192–93. He currently serves as the Director of Heart Failure Cardiology at St. Luke's Hospital in Chesterfield, Missouri, and was formerly an Associate Professor of medicine at Washington University School of Medicine. LaRue CV at 1; Tr. at 193; First LaRue Rep. at 1. He is board-certified by the American Board of Internal Medicine in General Cardiology and Advanced Heart Failure and Cardiac Transplant. LaRue CV at 3; Tr. at 193; First LaRue Rep. at 1.

Dr. LaRue disputed the validity of Petitioner's medical theory—that her October 17, 2019 vaccination sparked an anaphylactic reaction that eventually led to her development of Takotsubo cardiomyopathy. Tr. at 195. In so doing, he highlighted the significance of Petitioner's medical assessment on October 17, 2019—specifically the notation describing her COPD as "moderate severe, GOLD group B grade III." *Id.* at 197; Ex. 2 at 362. Dr. LaRue further emphasized that Petitioner had an FEV1 was listed at 36%, which is in the severe COPD range. Tr. at 197. These medical concerns more credibly explained Petitioner's distress than an allergic reaction brought on by vaccination.

In addition, Dr. LaRue noted that within a year of the purported anaphylactic reaction, Petitioner had undergone two pulmonary stress tests—the first on October 16, 2018 (approximately one year prior to vaccination), and the second on October 17, 2019 (the day of vaccination). Tr. at 198. But the 2019 test results, compared to results from the year prior, revealed that Petitioner was at that time under *more* distress and doing worse. *Id.* at 200; First LaRue Rep. at 4 ("[d]eveloping hypoxemia during the 6-minute walk test is a sign of advanced COPD"); *see also* D. Kaminsky, *Overview of Pulmonary Function Testing in Adults*, in *UpToDate* (P. Dieffenbach ed., Wolters Kluwer, uptodate.com (last visited July 2, 2026)), filed as Ex. D-1 (ECF No. 28-2) (suggesting that an improvement of approximately thirty meters in distance walked is the minimally important difference in interpreting the stress test outcomes). Based on his review of the pulmonary stress test results from October 2019, Dr. LaRue speculated that Petitioner was either in atrial fibrillation for the entirety of the test, or had gone into atrial fibrillation during the

walk. Tr. at 200. Of note, Dr. LaRue opined that it was certainly possible that going into atrial fibrillation during the test acutely worsened her lung function, and could have possibly led to the downstream of her shortness of breath. *Id.* at 205.

Dr. LaRue opined that the most likely cause of Petitioner's Takotsubo was her longstanding acute respiratory failure requiring mechanical ventilation. He agreed with Dr. Doorey's assertion that the rush of catecholamines released as a result of Petitioner's respiratory failure could result in Takotsubo cardiomyopathy. Tr. at 206. He did not, however, agree that Petitioner's clinical presentation, or sequence of events, were more likely caused by anaphylactic reaction to the flu vaccine after one vaccination event. *Id.*

## III. Procedural History

This case was initiated in July 2022 (after the process for evaluating the sufficiency of document filings in the case was completed), it was assigned to my own docket in September 2022. *See* Docket Entry, dated Sept. 8, 2022 (ECF No. 8). Respondent filed his Rule 4(c) Report contesting Petitioner's right to compensation on March 13, 2023. *See* Report, dated Mar. 13, 2023 (ECF No. 15). Thereafter, the parties engaged in submitting expert reports, with the final report from Dr. Doorey filed on December 4, 2024. The parties submitted pre-hearing submissions and a one-day entitlement hearing took place on October 21, 2025, in Washington, D.C. The matter is ripe for resolution.

## IV. Applicable Legal Standards

### A. *Petitioner's Overall Burden in Vaccine Program Cases*

To receive compensation in the Vaccine Program, a petitioner must prove either: (1) that she suffered a "Table Injury"—i.e., an injury falling within the Vaccine Injury Table—corresponding to one of the vaccinations in question within a statutorily prescribed period of time or, in the alternative, (2) that her illnesses were actually caused by a vaccine (a "Non-Table Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; § 11(c)(1)(C)(ii)(I); *see also Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006).[10] Pursuant to the Vaccine Injury Table, anaphylaxis following a flu vaccine is compensable if it manifests within four or less hours of the vaccine. 42 C.F.R. § 100.3(a)(XVI)(A). Petitioner does not allege a Table Injury for anaphylaxis, however.

---

[10] Decisions of special masters (some of which I reference in this ruling) constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998). By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Hum. Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd* 104 F. App'x. 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Hum. Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Hum. Servs*., 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on her assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

In attempting to establish entitlement to a Vaccine Program award of compensation for a Non-Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen v. Sec'y of Health and Hum. Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005): "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury."

Each *Althen* prong requires a different showing. Under *Althen* prong one, petitioners must provide a "reputable medical theory," demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford*, 451 F.3d at 1355–56 (citations omitted). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Id.* at 549.

Petitioners may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1378–79 (Fed. Cir. 2009) (citing *Capizzano*, 440 F.3d at 1325–26). Special masters, despite their expertise, are not empowered by statute to conclusively resolve what are essentially thorny scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* at 1380. Accordingly, special masters must take care not to increase the burden placed on petitioners in offering a scientific theory linking vaccine to injury. *Contreras v. Sec'y of Health & Hum. Servs.*, 121 Fed. Cl. 230, 245 (May 6, 2015) ("[p]lausibility . . . in many cases *may* be enough to satisfy *Althen* prong one" (emphasis in original)).

In discussing the evidentiary standard applicable to the first *Althen* prong, the Federal Circuit has consistently rejected the contention that it can be satisfied merely by establishing the proposed causal theory's scientific or medical *plausibility*. *See Cerrone v. Sec'y of Health & Hum. Servs.*, 146 F.4th 1113, 1121 (Fed. Cir. 2025) (the argument that *Althen* prong one requires only a showing of plausibility "understates the burden [a petitioner] bears under the first factor in the *Althen* formulation"); *Kalajdzic v. Sec'y of Health & Hum. Servs.*, No. 2023-1321, 2024 WL 3064398, at *2 (Fed. Cir. June 20, 2024) (arguments "for a less than preponderance standard" deemed "plainly inconsistent with our precedent" (*citing Moberly*, 592 F.3d at 1322)); *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019); *see also Howard v. Sec'y of Health & Hum. Servs*., 2023 WL 4117370, at *4 (Fed. Cl. May 18, 2023) ("[t]he standard has been preponderance for nearly four decades"), *aff'd*, 2024 WL 2873301 (Fed. Cir. June 7, 2024) (unpublished). And petitioners always have the ultimate burden of establishing their *overall* Vaccine Act claim with preponderant evidence. *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013) (citations omitted); *Tarsell v. United States*, 133 Fed. Cl. 782, 793 (2017) (noting that *Moberly* "addresses the petitioner's overall burden of proving causation-in-fact under the Vaccine Act" by a preponderance standard).

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375–77; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). In establishing that a vaccine "did cause" injury, the opinions and views of the injured party's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1280). Medical records are generally viewed as particularly trustworthy evidence, since they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Medical records and statements of a treating physician, however, do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. Section 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Hum. Servs*., 88 Fed. Cl. 706, 746 n.67 (2009) ("there is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted"). As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases. The views of treating physicians should be weighed against other, contrary evidence also present in the record—including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 742, 749 (2011) (not arbitrary or capricious

for special master to weigh competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Veryzer v. Sec'y of Dept. of Health & Hum. Servs.*, No. 06-522V, 2011 WL 1935813, at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd*, 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 F. Appx. 765 (Fed. Cir. 2012).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must align with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 542 (2011), *recons. den'd after remand*, 105 Fed. Cl. 353 (2012), *aff'd mem.*, 503 F. Appx. 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Hum. Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for rev. den'd* (Fed. Cl. Dec. 3, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

B. *Legal Standards for Significant Aggravation Claim*

Where a petitioner alleges significant aggravation of a preexisting condition, the *Althen* test is expanded, and the petitioner has additional evidentiary burdens to satisfy. *Loving v. Sec'y of Health & Hum. Servs.*, 86 Fed. Cl. 135, 144 (2009). In *Loving*, the Court of Federal Claims combined the *Althen* test with the test from *Whitecotton v. Sec'y of Health & Hum. Servs.*, 81 F.3d 1099, 1107 (Fed. Cir. 1996), which related to on-Table significant aggravation cases. The resultant "significant aggravation" test has six components, which require establishing:

> (1)the person's condition prior to administration of the vaccine, (2) the person's current condition (or the condition following the vaccination if that is also pertinent), (3) whether the person's current condition constitutes a 'significant aggravation' of the person's condition prior to vaccination, (4) a medical theory causally connecting such a significantly worsened condition to the vaccination, (5) a logical sequence of cause and effect showing that the vaccination was the reason for the significant aggravation, and (6) a showing of a proximate temporal relationship between the vaccination and the significant aggravation.

*Loving*, 86 Fed. Cl. at 144; *see also W.C.*, 704 F.3d at 1357 (holding that "the *Loving* case provides the correct framework for evaluating off-table significant aggravation claims"). In effect, the last three prongs of the *Loving* test correspond to the three *Althen* prongs.

In *Sharpe v. Sec'y of Health & Hum. Servs.*, 964 F.3d 1072 (Fed. Cir. 2020), the Federal Circuit further elaborated on the *Loving* framework. Under Prong (3) of the *Loving* test, a petitioner need not demonstrate an *expected* outcome, but merely that her current-post vaccination condition was worse than pre-vaccination. *Sharpe*, 964 F.3d at 1081. And a claimant may make out a prima facie case of significant aggravation overall without eliminating a preexisting condition as the potential cause of her significantly aggravated injury (although the Circuit's recasting of the significant aggravation standard still permits Respondent to attempt to establish alternative cause, after the burden of proof has shifted to Respondent). *Id.* at 1083.

It remains uncertain as to what *degree* of aggravation of a pre-vaccination condition would be enough to be considered "significant." The Circuit has made clear that the level of aggravation need not be shown to have been catastrophic. *Osenbach v. Sec'y of Health & Hum. Servs.*, No. 2024-1663, 2025 WL 2387944, at *4 (Fed. Cir. Aug. 188, 2025) ("[r]equiring a petitioner to demonstrate that vaccination "wholly altered" their pre-vaccination condition would be at odds with our holding in *Sharpe v. Sec'y of Health & Hum. Servs.* that the *Loving* test does not require petitioners to provide conclusive evidence linking their vaccines to their significant aggravation"). But this aspect of *Osenbach* (which otherwise affirmed dismissal of a significant aggravation claim) seems to pertain only to the well-understood fact that worsening need only be demonstrated *preponderantly*—like any other *Loving* or *Althen* prong.

At a minimum, then, a claimant's injury or disease course must *likely* exceed what that individual might have experienced but for vaccination. A transient worsening (say, due to usual vaccine-associated malaise, experienced immediately after vaccination but which subsides thereafter) is not sufficient—in keeping with the fact that all Program claimants must meet the six-month "severity requirement."[11]

C. *Legal Standards Governing Factual Determinations*

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. Section 11(c)(2). The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are

[11] A person with an existing illness could not rely on the mere fact of that illness and its post-vaccination course to prove severity. Rather, it is reasonable to require they preponderantly establish that any symptoms or disease worsening that can be linked to the vaccine results in more than six months of sequelae *specific* to the vaccine's impact. A transient post-vaccination reaction would not meet this standard, no matter how individually severe, if the reaction subsides in less than the Act's six-month timeframe – even if the preexisting condition persists. *See Faoro v. Sec'y of Health & Hum. Servs.*, No. 10-704V, 2016 WL 675491, at *27 (Fed. Cl. Spec. Mstr. Jan. 29, 2016), *mot. for review den'd*, 128 Fed. Cl. 61 (Fed. Cl. Apr. 11, 2016) (finding that "the vaccinations would not have changed [petitioner's] clinical course and thus, the vaccinations did not significantly aggravate her preexisting condition").

contained in the record and the summaries and conclusions." Section 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (determining that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is evidenced by a rational determination).

As noted by the Federal Circuit, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras*, 993 F.2d at 1528; *Doe/70 v. Sec'y of Health & Hum. Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd*, *Rickett v. Sec'y of Health & Hum. Servs*., 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion). A series of linked propositions explains why such records deserve some weight: (i) sick people visit medical professionals; (ii) sick people attempt to honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Hum. Servs.*, 26 Cl. Ct. 537, 543 (1992), *aff'd*, 993 F.2d at 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms").

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs*., No. 03–1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are often found to be deserving of greater evidentiary weight than oral testimony—especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs*., 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, the Federal Circuit has also noted that there is no formal "presumption" that records are accurate or superior on their face to other forms of evidence. *Kirby v. Sec'y of Health & Hum. Servs.,* 997 F.3d 1378, 1383 (Fed. Cir. 2021). There are certainly situations in which compelling oral or written testimony (provided in the form of an affidavit or declaration) may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs*., 69 Fed. Cl. 775, 779 (2006) ("like any

norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Hum. Servs*., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Hum. Servs*., No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs*., 110 Fed. Cl. 184, 203–04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

### D. *Analysis of Expert Testimony*

Establishing a sound and reliable medical theory often requires a petitioner to present expert testimony in support of his claim. *Lampe v. Sec'y of Health & Hum. Servs*., 219 F.3d 1357, 1361 (Fed. Cir. 2000). Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594–96 (1993). *See Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999). Under *Daubert*, the factors for analyzing the reliability of testimony are:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

In the Vaccine Program the *Daubert* factors play a slightly different role than they do when applied in other federal judicial settings, like the district courts. Typically, *Daubert* factors are employed by judges (in the performance of their evidentiary gatekeeper roles) to exclude evidence that is unreliable or could confuse a jury. By contrast, in Vaccine Program cases these factors are used in the *weighing* of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs*., 94 Fed. Cl. 53, 66–67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted"). The flexible use of the *Daubert* factors to evaluate the persuasiveness and reliability of expert testimony has routinely been upheld. *See*, *e.g.*, *Snyder*, 88 Fed. Cl. at 742–45. In this matter (as in numerous other Vaccine Program cases), *Daubert* has not been employed at the threshold, to determine what evidence should be admitted, but instead to determine whether expert testimony offered is reliable and/or persuasive.

Respondent frequently offers one or more experts in order to rebut a petitioner's case. Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs*., 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). However, nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder*, 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 146 (1997)); *see also Isaac v. Sec'y of Health & Hum. Servs*., No. 08–601V, 2012 WL 3609993, at *17 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for review den'd*, 108 Fed. Cl. 743 (2013), *aff'd*, 540 F. App'x 999 (Fed. Cir. 2013) (citing *Cedillo*, 617 F.3d at 1339). Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters must subject expert testimony in Vaccine Program cases. *Moberly*, 592 F.3d at 1325–26 ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs*., 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

E. *Consideration of Medical Literature*

Both parties filed numerous items of medical and scientific literature in this case, but not all such items factor into the outcome of this case. While I have reviewed all the medical literature submitted in this case, I discuss only those articles that are most relevant to my determination and/or are central to Petitioner's case—just as I have not exhaustively discussed every individual medical record filed. *Moriarty v. Sec'y of Health & Hum. Servs.*, No. 2015–5072, 2016 WL 1358616, at *5 (Fed. Cir. Apr. 6, 2016) ("[w]e generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his

decision") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.,* 527 F. App'x 875, 884 (Fed. Cir. 2013) ("[f]inding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered").

## ANALYSIS

### I. Petitioner Cannot Demonstrate Post-Vaccination Severity For Anaphylaxis

Because this case involves an alleged initial anaphylactic/allergic reaction, some discussion of that claim's Table elements is worthwhile (even though Petitioner does not formally assert this form of claim). Pursuant to the Vaccine Injury Table, anaphylaxis following a flu vaccine is compensable if it manifests within four or less hours of vaccination. 42 C.F.R. § 100.3(a)(XVI)(A). The Qualifications and Aids to Interpretation ("QAI") also specify that:

> Anaphylaxis is an acute, severe, and potentially lethal systemic reaction that occurs as a single discrete event with simultaneous involvement of two or more organ systems. Most cases resolve without sequela. Signs and symptoms begin minutes to a few hours after exposure. Death, if it occurs, usually results from airway obstruction caused by laryngeal edema or bronchospasm and may be associated with cardiovascular collapse. Other significant clinical signs and symptoms may include the following: "Cyanosis, hypotension, bradycardia, tachycardia, arrhythmia, edema of the pharynx and/or trachea and/or larynx with stridor and dyspnea. There are no specific pathological findings to confirm a diagnosis of anaphylaxis.

42 C.F.R. § 100.3(c)(1).

Petitioner alleges that two hours after her receipt of the flu vaccine on October 17, 2019, she began to experience "severe respiratory distress" while driving Br. at 4, 12. After calling EMS, Petitioner arrived by ambulance to the CHI Franciscan Health ED having been intubated and sedated. Ex. 3 at 22. Further, Petitioner alleges that "[t]he stress of this acute exacerbation of [her] underlying COPD resulting in intubation led [her] to develop the new cardiac condition of Takotsubo cardiomyopathy and put her back into atrial fibrillation (abnormal heart rhythm). The stress further aggravated [her] preexisting anxiety and also caused her to develop PTSD." Br. at 12.

Although Petitioner advances a claim of significant aggravation, certain aspects of her claim *would* satisfy some core Table elements of anaphylaxis, as discussed above. She received a covered vaccine, and her alleged onset/reaction occurred within four hours of vaccination. She also can point to the evidence of a similar reaction two years before. And there is some treater evidence suggesting speculation that there was a relationship between the vaccination and her same-day response. At the same time, none of Petitioner's treating physicians formally

diagnosed her with anaphylaxis, despite it having been briefly considered as a differential diagnosis. The medical records further demonstrate that the flu vaccine was never identified or established as a likely allergen, and treater notes document hesitation in finding Petitioner was truly allergic to the flu vaccine. *See* Ex. 2 at 111, 341; Ex. 3 at 76; Ex. 4 at 180; Ex. 6 at 51.

However, even assuming the Table elements of anaphylaxis could be proven, all Program claims are subject to the requirement that a petitioner demonstrate that she has suffered the residual effects or complications of an injury for more than six months after vaccine administration. Section 11(c)(1)(D). It is here where an anaphylaxis claim would fail (and although I am cognizant of the fact that this is not the framework for Petitioner's claim, discussion of it has relevance to my analysis below – since in either case, Petitioner is claiming she experienced an acute reaction to vaccination that had lingering residual effects).

To meet the Act's severity requirement, an alleged injury's residual effects must be demonstrated not only to exist, but also to be *associated* with the initial vaccine-related injury. Unrelated subsequent harm is not enough. *See, e.g.*, *Pearson v. Sec'y of Health & Hum. Servs.*, No. 17-489V, 2019 WL 1150044, at *11 n.13 (Fed. Cl. Spec. Mstr. Feb. 7, 2019) (finding symptoms could not satisfy the six-month severity requirement because petitioner failed to persuasively link the alleged residual effects to her alleged initial anaphylaxis-type reaction); *but see Price v. Sec'y of health & Human Servs.*, No. 11-442V, 2015 WL 7423070, at *7 (Fed. Cl. Spec. Mstr. Oct. 29, 2015) (awarding compensation to petitioner who experienced Table anaphylaxis that caused ongoing seizures for more than six months). Thus, a single anaphylactic event must be demonstrated to have resulted in *some* subsequent symptoms or complications that persisted or unfolded for at *least* six months thereafter. (In "classic" cases of anaphylaxis, a petitioner who faints after receiving a vaccine and then hurts himself, requiring six or more months of treatment or invasive surgical procedures, would easily be able to show severity).

Here, to meet the six-month severity requirement (and assuming for sake of argument she did experience an anaphylactic reaction of some kind attributable to the flu vaccine), Petitioner would need to preponderantly show that her alleged injuries and exacerbation of underlying preexisting COPD and other cardiac concerns were causally linked to her initial anaphylaxis on October 17, 2019, and resulted in Takotsubo cardiomyopathy, or some other medical issues. But the medical record does not support this conclusion.

First, no treaters accepted the contention that the October 2019 vaccine explained what followed, even if an immediate vaccine association was deemed by some treaters (although not all) possible. *See, e.g.*, Ex. 6 at 50–51 (January 2021 visit with Dr. Mokha). Second, Petitioner's course over time is not consistent with a vaccine-sparked reaction that progressed or persisted. Rather, the record establishes that at most Petitioner experienced a transient, allergic-like reaction—in the midst of ongoing treatment for her chronic, and severe, COPD, and while she

was experiencing other stressors capable of sparking Takotsubo cardiomyopathy—that did not itself continue to progress months or years after. I also observe that as reflected in the record, Petitioner's cardiac evaluations after her fall 2019 treatment were more sporadic, and often occurred in response to other things happening in her life rather than reflecting consistent complaints that could be linked to the October 2019 vaccination.

Third, Petitioner has not demonstrated that chronic Takotsubo cardiomyopathy *could* be a residual effect of an allergic or anaphylactic reaction to a vaccine, capable of lasting for six months post-onset (as opposed to a one-time, self-limiting event)—or was so in this case. Rather, the evidence points to numerous other explanations for recurrent cardiac concerns that Petitioner experienced after October 2019. In particular, Petitioner's demonstrated cardiac issues pre-vaccination far better explain her ongoing concerns. Dr. LaRue opined persuasively, for example, that Petitioner's Takotsubo was "most likely secondary to her acute respiratory failure and mechanical ventilation, which were likely a result of her COPD exacerbation." First LaRue Rep. at 6. She unquestionably had a demonstrated medical history for decompensation of her COPD pre-vaccination, and was experiencing symptoms (that had worsened pre-vaccination, as Dr. LaRue showed when comparing her stress test results from 2018 to 2019) even *on the day* she received the flu vaccine at issue. Ex. 2 at 363–64. She was thus likely to experience these kinds of symptoms independent of any vaccine reaction.

In addition, Petitioner's personal life stressors could very clearly spark instances of Takotsubo cardiomyopathy. G. Reeder & A. Prasad, *Clinical Manifestations and Diagnosis of Stress (Takotsubo) Cardiomyopathy*, in UpToDate (T. Dardas, ed., 2023), Clinical manifestations and diagnosis of stress (takotsubo) cardiomyopathy - UpToDate (last visited July 17, 2026), filed as Ex. B-8 (ECF No. 23-9). And Petitioner's experts did not sufficiently distinguish these many other factors from the initial vaccination event and purported reaction. Thus, I do not find on this record that Petitioner's alleged reaction to the October 2019 vaccine was more than transient, and did not likely have any residual effects more likely to result in future symptoms than her preexisting COPD and cardiac issues.

## III. Petitioner's Significant Aggravation Claim Has Not been Preponderantly Established

Even if it is assumed that Petitioner's post-vaccination course generally "meets" the severity requirement (since it is clear she continued for more than six months to experience cardiac and CODP-related health issues), Petitioner's core claim—that her preexisting cardio-pulmonary condition was *worsened* due to some putative vaccine reaction - has not been preponderantly demonstrated. I address below the *Loving* prongs that are most relevant to my determination.

A. Petitioner Did Not Establish a Reliable Causation Theory (*Loving* Prong Four)

Petitioner was tasked with setting forth a reliable and persuasive causal theory—rooted in accepted medical or scientific evidence, as explained by properly-credentialed experts with demonstrated knowledge—establishing that the flu vaccine could not only provoke an allergic response causing respiratory distress, but that the reaction could further result in development of Takotsubo cardiomyopathy or merely CODP aggravation. This Petitioner did not accomplish, despite the efforts of several experts and treaters. Rather, Petitioner's three testifying experts offered opinions that were overly generalized, persuasively rebutted by Respondent's experts, and/or unsupported by reliable medical literature.

Although Dr. Blaiss conceded that "[Petitioner's] reaction to the influenza vaccination may not be classic anaphylaxis", he did not elaborate further. *See* Blaiss Supp. Rep. at 3. Instead, he theorized that the flu vaccine can act as a trigger for Takotsubo cardiomyopathy via a "sudden postvaccination change in the cardiac sympathetic discharge." First Blaiss Rep. at 8; K. Singh et al., *Takotsubo Cardiomyopathy after Anti-Influenza Vaccination; Catecholaminergic Effects of Immune System*, 31 Am. J. of Emergency Med. 1627.e1 (2013), filed as Ex. 14 (ECF No. 18-9) ("Singh"); F. Santoro et al., *Tako-Tsubo Cardiomyopathy after Influenza Vaccination*, 167 Int'l J. of Cardiology e51 (2013), filed as Ex. 15 (ECF No. 18-10); R. Desai et al., *Takotsubo Syndrome in Patients with Influenza Infection or Anti-Influenza (Flu) Vaccination*, 1 Aging & Health Res. 2 (2021), filed as Ex. 16 (ECF No. 18-11) ("Desai").

However, Dr. Blaiss's reliance on the above-mentioned case reports and case series was not well founded. In too many Program decisions to count, it has been established that case reports are flimsy evidence for causation. *Bielak v. Sec'y of Health & Hum. Servs.*, No. 18-761V, 2023 WL 35509, at *35 (Fed. Cl. Spec. Mstr. Feb. 7, 2019). Indeed, the Desai article acknowledged the need for larger studies to find more conclusive evidence of a causal association between the flu vaccine and/or infection with cardiovascular disease such as Takotsubo cardiomyopathy, while the Singh article stated that "there is no previous distinctive evidence linking vaccination of any sort with emergence of [Takotsubo cardiomyopathy]." Desai at 1; Singh at 1627.e1. An association is thus only speculative, not preponderantly established.

In contrast, Dr. LaRue persuasively established that Takotsubo cardiomyopathy, an exacerbation of COPD, atrial fibrillation, and/or anxiety could not be worsened by vaccination, even if the vaccine was capable of instigating an immediate allergic reaction. A systemic review of the medical literature assessed serious adverse events from randomized clinical trials (totaling 8462 influenza vaccination) but found that "few events requiring major medical attention or hospitalization were described" and of those, "none [were] judged as related to vaccination by the investigators." W. Beyer et al., *Immunogenicity and Safety of Inactivated Influenza Vaccines in Primed Populations: A Systemic Literature Review and Meta-Analysis*, 29 Vaccine 5785,

5789 (2011), filed as Ex. B-6 (ECF No. 23-7). In addition, Dr. LaRue provided medical literature demonstrating that (1) the flu vaccine has been associated with *lower* rates of cardiovascular outcomes such as myocardial infarction, all-cause mortality, and major adverse cardiac events; and (2) patients with COPD did *not* experience symptoms exacerbation in the fourteen days following the receipt of a flu vaccine. *See* R. Loomba et al., *Influenza Vaccination and Cardiovascular Morbidity and Mortality: Analysis of 292,383 Patients*, 17 J. of Cardiovascular Pharmacology & Therapeutics 277, 281 (2012), filed as Ex. B-7 (ECF No. 23-8); Bekkat-Berkani et al., *Seasonal Influenza Vaccination in Patients with COPD: A Systemic Literature Review*, 17 BMC Pulmonary Medicine 1 (2017), filed as Ex. B-9 (ECF No. 23-10) ("Bekkat-Berkani") In fact, the literature reveals that the flu vaccine *reduced* the number of COPD exacerbations and hospitalizations. Bekkat-Berkani at 12.

Thus, it was not preponderantly established in this case that the flu vaccine can trigger Takotsubo and/or exacerbation of CODP.

B. Petitioner Did Not Successfully Show that the Flu Vaccine Likely Caused Her Condition to Worsen (*Loving* Prong Five)

The medical record in this case does not support the conclusion that the flu vaccine Petitioner received on October 17, 2019, likely precipitated a worsening of her underlying COPD, atrial fibrillation, and psychological issues. Rather, the evidence establishes that Petitioner's health progression was unfortunately running in a downward direction before, or even at the time of, the vaccination at issue, independent of the vaccine (which at worst prompted a temporary response that abated soon thereafter).

Dr. Doorey maintained that Petitioner was administered the flu vaccine under very similar circumstances to her 2018 appointment (including pulmonary stress testing that resulted in decreased oxygen saturation with substantially identical underlying health condition to the prior year). However, Dr. LaRue, contrasting both pulmonary stress test results, observed the meaningful difference between them, with her 2019 results reflecting a lack of improvement and more severity than the year before. LaRue Supp. Rep. at 2. Tellingly, those second results were obtained the same day Petitioner received the flu vaccine in question. In addition, her increased heart rate suggested to Dr. LaRue that Petitioner was likely already in atrial fibrillation at the time of her October 2019 visit. *Id.* ("[s]everely elevated heart rates (called rapid ventricular response) are frequent complication of atrial fibrillation").

Dr. LaRule also persuasively rebutted Petitioner's assertion that the medical records did not suggest that she was experiencing an acute exacerbation of her underlying COPD at the time of her vaccination. Petitioner had reported worsening shortness of breath on the *same day* as vaccination, as well as the significant difference in her pulmonary stress tests (i.e., decreased oxygen saturation, shorter distance walked, and a dramatically elevated heart rate). LaRue Supp.

Rep. at 2–3; Ex. 2 at 363 –64, 1143. The evidence in totality suggested that Petitioner was in fact in a decompensated state at the time of vaccination. Moreover, there is ample record evidence documenting the waxing and waning nature of Petitioner's condition from the end of 2019 through 2021—which is not only more consistent with her pre-existing conditions, but better explained by her personal circumstances/stressors in her life (i.e., being a habitual smoker and navigating her son's cancer diagnosis), which intermittently impacted her health post-vaccination.

Ultimately, the record preponderantly supports the conclusion that Petitioner's sporadic, Takotsubo-like events were "most likely secondary to her acute respiratory failure and mechanical ventilation, which were likely a result of her COPD exacerbation." LaRue First Rep. at 6. Petitioner had a demonstrated medical history for decompensation of her COPD pre-vaccination, and revealed severe symptoms the same day she received the flu vaccine. Ex. 2 at 363-64. She also had "known persistent atrial fibrillation, with four separate episodes occurring prior to her episode during the 10/17/19 hospitalization", making her more likely to be at "high risk [for] recurrent atrial fibrillation episodes." LaRue First Rep. at 6 (citations omitted). These preexisting concerns all better explain her ongoing, post-vaccination issues than a transient reaction to one vaccination.

C. *Loving* Prong Three: Petitioner Did Not Show that Her Post-Vaccination Course was Sufficiently Worse to Constitute a Significant Aggravation of her Preexisting Conditions (*Loving* Prong Three)

*Loving* prong three requires a petitioner alleging a non-Table significant aggravation claim to demonstrate that his or her illness or injury was "significantly aggravated." Merely showing that the claimant's condition was objectively worse after vaccination than before does not satisfy this requirement, as a preexisting condition might be expected to independently cause a person's health to deteriorate over time. *Locane v. Sec'y of Health & Hum. Servs.*, 685 F.3d 1375, 1381–82 (Fed. Cir. 2012); *Hennessey v. Sec'y of Health & Hum. Servs.*, No. 01-190V, 2009 WL 1709053 at *42 (Fed. Cl. Spec. Mstr. May 29, 2009), *mot. for review den'd*, 91 Fed. Cl. 126 (2010). Thus, to satisfy this *Loving* prong, a claimant must show that his or her course was worse than what would have been expected based on available knowledge about the claimant's condition. *Locane*, 685 F.3d at 1381–82.

In many cases, proof of this element is almost a foregone conclusion (especially since Petitioners are absolved from having to establish an expected injury/illness course as a comparison). But in this matter (and parallel with my discussion above of a lack of evidence of anaphylaxis-caused residual effects sufficient to prove severity), I cannot conclude that Petitioner was necessarily "worse" in terms of her preexisting cardiac issues after vaccination. Instead, Petitioner's health was not robust pre-vaccination, and she continued to experience declining health issues in the wake of the October 2019 vaccination, with some non-vaccine-

related tragedies and events yielding Takotsubo symptoms flares. She has a demonstrated three-plus year history of cardiac issues before the flu vaccine in question was administered, and she consistently continued to experience similar symptoms after. Petitioner's overall course does not demonstrate worsening, even if she had additional cardiac events after October 2019.

## CONCLUSION

Because Petitioner did not carry her preponderant burden of showing causation, I am compelled to deny compensation.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with the terms of this Decision.[12]

**IT IS SO ORDERED.**

/s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

[12] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.